**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Chapter 11, Subchapter V |
| | ) | |
| ANEAKA UKAH, | ) | Case No. 24-61070-bem |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S FIRST INDIVIDUAL PLAN OF REORGANIZATION OF ANEAKA UKAH**

**Dated this 16th day of January, 2025**

_____

Filed By:
Michael D. Robl
Maxwell Bowen
Robl Law Group LLC
3750 Lavista Road, Suite 250
Tucker, GA 30084
(404) 373-5153 (phone)
(404) 537-1761 (fax)
michael@roblgroup.com (email)
max@roblgroup.com (email)
**Attorneys for Debtor**

**Background for Cases Filed Under Subchapter V**

This Plan of Reorganization (the "*Plan*") is filed under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. 101 *et seq.* (the "*Bankruptcy Code*"). The following information is intended to assist creditors and other parties in interest in evaluating the Plan. For simplicity, the format of this Plan generally follows the format set forth in Official Form 425A (titled "Plan of Reorganization for Small Business under Chapter 11"), as approved by the Judicial Conference.

**A. Description and History of the Debtor's Business.**

The Debtor is an individual named Mrs. Aneaka Ukah also known as Ms. Aneaka English (the "*Debtor" or "Ms. Ukah"*).

Mrs. Ukah has two decades of experience in the real industry. Over that time period, Mrs. Ukah has developed knowledge and experience related to developing real estate, real estate construction, real estate financing, real property "flipping" (with and without renovating), real property contract flipping, and related real estate investing.

**i.      Education and work history.**

Mrs. Ukah received a Bachelor's degree in Economics from American University.

Mrs. Ukah has spearheaded real estate projects in both the residential and commercial sectors for approximately 20 years. Like many real estate developers, Mrs. Ukah would form separate entities for different ventures. A brief explanation of each business entity in which Mrs. Ukah has a direct or indirect interest follows.

**ii.      Business operations.**

The various entities in which Mrs. Ukah has a direct or indirect interest are shown on the organizational chart attached as **Exhibit "A"** hereto. Some of those entities are as follows.

*Company Name:*                    *Focus:*

| Company Name | Focus |
|---|---|
| E.S. Real Estate Consortium, Corp. | This entity serves as a parent company or holding company for other legal entities which have specific purposes tied to separate real estate projects, often organized by geographic location of the real estate. |
| E.S. Realty Group, LLC | This entity is the holding company or parent company for a number of entities that owned real property, or interests in real property, in Georgia, South Carolina, Florida, Tennessee, and/or Washington DC |
| WSRE Georgia, LLC | This entity was organized to invest in real estate located in Georgia. The entity filed Chapter 7 |

| | bankruptcy due to not having substantive ongoing operations after the COVID-19 pandemic, and as a result of ongoing costs of a lawsuit filed in California that named this entity and numerous affiliates as defendants. |
|---|---|
| WSRE S. Carolina, LLC | This entity was organized to invest in real estate located in South Carolina. The entity filed Chapter 7 bankruptcy due to not having substantive ongoing operations after the COVID-19 pandemic, and as a result of ongoing costs of a lawsuit filed in California that named this entity and numerous affiliates as defendants. |
| WSRE Florida, LLC | This entity was organized to invest in real estate located in Florida. The entity filed Chapter 7 bankruptcy due to not having substantive ongoing operations after the COVID-19 pandemic, and as a result of ongoing costs of a lawsuit filed in California that named this entity and numerous affiliates as defendants. |
| Selling N Atlanta, LLC | This entity was organized to invest in real estate located in Atlanta, Georgia. The entity filed Chapter 7 bankruptcy due to not having substantive ongoing operations after the COVID-19 pandemic, and as a result of ongoing costs of a lawsuit filed in California that named this entity and numerous affiliates as defendants. |
| Selling N Charleston, LLC | This entity was organized to invest in real estate located in Charleston, South Carolina. The entity filed Chapter 7 bankruptcy due to not having substantive ongoing operations after the COVID-19 pandemic, and as a result of ongoing costs of a lawsuit filed in California that named this entity and numerous affiliates as defendants. |
| Selling N Richmond, LLC | This entity was organized to invest in real estate located in Richmond, Virginia. The entity filed Chapter 7 bankruptcy due to not having substantive ongoing operations after the COVID-19 pandemic, and as a result of ongoing costs of a lawsuit filed in California that named this entity and numerous affiliates as defendants. |

iii.     **Events leading to bankruptcy.**

Mrs. Ukah's primary business is engaging in transactions, through various entities, in the real estate industry. Like many individuals who work in the real estate industry, Debtor she not typically own real estate in her personal name which is the subject of business transactions, but rather does so through single-purpose entities or limited purpose entities that may buy, sell, lease, renovate, develop, or otherwise engage in commercial real estate transactions.

Mrs. Ukah was named as a defendant in a multi-party lawsuit in California (the "California Litigation") as a result of a real estate venture in which she was not the individual who had contact with investors, but in which those investors (the "California Plaintiffs") named Debtor and numerous entities affiliated with her (the "Affiliated Entities") as Defendants when issues arose with the venture they had invested in, and which had provided loans to the Affiliated Entities.

Because Ms. Ukah had no direct communications with the California Plaintiffs, she had not represented anything to the California Plaintiffs about the real estate investments, purposes of the loaned funds, or otherwise. The very short promissory notes executed by the Affiliated Entities had no representations about uses of funds, warranties about uses of funds, or limitations on uses of funds.

The Affiliated Entities are currently each non-operating businesses at this time, and have been defunct for a number of years. However, Mrs. Ukah felt compelled to defend the Affiliated Entities in the California Litigation because the California Plaintiffs asserted claims to seek to pierce the corporate veil of the Affiliated Entities to attempt to hold Mrs. Ukah liable on an individual basis.

The costs and time burdens of the California Litigation grew over time, and legal counsel defending the California Litigation was not providing timely and full updates on the status of the California Litigation, to the point that Mrs. Ukah concluded it was more practical to place the Affiliated Entities into Chapter 7 bankruptcy cases to demonstrate to the California Plaintiffs that those entities had little or no assets, as an objective Trustee could verify, were not operating, and should not be subjected to ongoing litigation. Mrs. Ukah caused each of the Affiliated Entities to file Chapter 7 bankruptcy cases in Georgia. Those Affiliated Entities are WSRE Georgia LLC, WSRE Florida LLC, WSRE S. Carolina LLC, Selling N Atlanta LLC, Selling N Charleston LLC, and Selling N Richmond LLC. Each of the Affiliated Entities remains in their respective Chapter 7 cases currently.

Mrs. Ukah also faced debt resolution issues apart from being named as a party in the California Litigation. Specifically, Mrs. Ukah had unpaid real property taxes in conjunction with the residence that she co-owns with her husband which is located at 2564 Tucker Mill Road, SW, Conyers, Georgia ("Debtor's Residence"). Mrs. Ukah also had a partially paid Judgment against her from a real estate venture, and had a lawsuit pending for the collection of legal fees by a law firm that had represented her in litigation.

With regard to the unpaid real property taxes connected to Debtor's Residence, Rockdale County had filed a tax lien on that property and subsequently sold the tax lien at a public auction. Mrs. Ukah is within the twelve (12) month redemption period currently, and intends to redeem Debtor's Residence from the tax lien. The process, however, is not simple because the purchaser of the tax deed on Debtor's Residence bid more than the amount of the taxes (by approximately $300,000), but the County will not release the overbid funds or excess proceeds to Mrs. Ukah and her husband. Mrs. Ukah has been in communications with Rockdale County, both directly and through legal counsel, and believes that she will shortly file an adversary proceeding to determine whether any party in interest has claims to the excess tax sale proceeds.

Mrs. Ukah valued Debtor's Residence at $1,100,00.00 in her Schedules of Assets. Debtor has no mortgage loan on that real property. After accounting for whatever debt amount encumbers the property from the tax deed, and for the undivided one-half interest of Mrs. Ukah's spouse, Mrs. Ukah has substantial equity in Debtor's Residence.

This bankruptcy case was filed to preserve the substantial equity in Debtor's Residence and to allow Mrs. Ukah to address the California Litigation, the other claims, and other litigation against her.

**B. Liquidation Analysis.**

To confirm this Plan, the Court must find that all creditors and equity interest holders who do not accept the Plan will receive at least as much under the Plan as such claim or equity interest holder would receive in a Chapter 7 liquidation. A liquidation analysis is attached to this Plan as **Exhibit "B."**

The Plan proposes to pay creditors as much as they would receive in a Chapter 7 liquidation, as the Plan commits income from Mrs. Ukah to pay creditors until the amount they receive equals or exceeds the net available under the liquidation analysis as shown on **Exhibit "B"** hereto.

**C. Ability to make future plan payments and operate without further reorganization.**

The Plan proponent must also show that the Debtor will have enough cash over the life of the Plan to make the required Plan payments and to pay the Debtor's ongoing expenses.

The Plan proponent has provided projected financial information as **Exhibit "C."**

The Plan proponent's financial projections show that the Debtor will have projected disposable income (as defined by Section 1191(d) of the Bankruptcy Code) for the period described in Section 1191(c)(2), which in this instance is a **60-month** payment plan, in the amount of **$6,000 per month**.

The final Plan payment is expected to be paid in the **sixtieth (60th)** month after the Effective Date of the Plan.  Nothing, however, shall prevent Debtor from making some or all Plan payments quicker than set forth herein ("Accelerated Payments"), if financial circumstances make such payments possible. Making Accelerated Payments shall not entitle Debtor to discount any portion of amounts paid to a claimholder, other than interest that may be accruing pursuant to the Plan, nor shall making Accelerated Payments entitled any claimholder to additional amounts or payments beyond what they would receive in normal installment over the duration of the Plan.

Creditors and other parties in interest are hereby notified that you should consult with your accountant, other financial advisor, or lawyer, if you have any questions pertaining to these projections.

## Article 1: Summary of Plan

This Plan proposes to pay creditors of Debtor from her future projected current monthly income and/or from personal savings.

Under the Plan, all allowed secured claims shall be paid in full up to the extent of the claim, or the value of the collateral securing each such claim, whichever is less.

Any priority claims, such as priority tax claims, allowed by the Court shall be paid in full.

This Plan also provides for the payment of administrative claims in full.

Non-priority unsecured creditors (also known as general unsecured creditors) holding allowed claims will receive distributions, in a pro rata amount based on the proportion of their claims to all general unsecured claims, after payment of secured claims, administrative expenses, and priority claims.

All creditors and equity security holders should refer to Articles 3 through 6 of this Plan for information regarding the precise treatment of their claim.  A disclosure statement that provides more detailed informationregarding this Plan and the rights of creditors and equity security holders is not being circulated with this Plan, as this case is filed under Subchapter V of Chapter 11 of the Bankruptcy Code.

**Your rights may be affected. You should read these papers carefully and discuss them with your attorney, if youhave one.  If you do not have an attorney, you may wish to consult one.**

## Article 2: Classification of Claims and Interests

| *Class Number* | *Description of Class* | *Treatment of Class* |
|---|---|---|
| Class 1 | Priority unsecured claims | The IRS has filed a Proof of Claim asserting a *priority* unsecured claims under 507(a). |
| Class 2 | Secured claim of Avery Francis and Mia Francis | The Class 2 claimants have a Judgment lien on Debtor's Residence, with a remaining balance due of approximately $49,000. |
| Class 3 | Secured claim of Georgia Department of Revenue | The Class 3 claimant may assert a tax lien on Debtor's Residence, with a remaining balance due of approximately $40,000.[1] |
| Class 4 | Non-priority unsecured claims, also known as general unsecured claims | Class 4 claimants are creditors who do not hold secured claims or claims entitled to priority. |
| Class 5 | Equity security holder, *i.e.*, claim of Mrs. Ukah as owner | The Class 5 claimant is Mrs. Ukah with regard to her rights in assets she owned as of the Petition date or acquired since that date. |

---

[1] Debtor is attempting to ascertain from the Department of Revenue what the balance of this claim is currently, and nothing set forth herein shall be binding on Debtor or prevent Debtor from amending the amount set forth herein of objecting to any claim of the Department of Revenue.

**Article 3: Treatment of Administrative Expense Claims, Priority Tax Claims, and Quarterly and Court Fees**

| | |
|---|---|
| 3.01 **Unclassified claims** | Under section § 1123(a)(1), administrative expense claims and priority tax claims are not required to be placed in classes. Debtor may place such claims into separate classes to designate treatment in a clear fashion, particularly with regard to any potentially disputed claims. |
| 3.02 **Administrative expense claims** | Each holder of an administrative expense claim allowed under § 503 of the Code, will be paid in full on the Effective Date of this Plan, in cash, or upon such other terms as may be agreed upon by the holder of the claim and the Debtor. |
| | If sufficient cash is not available as of the Effective Date to pay fees and expenses of Debtor's legal counsel, then Debtor's legal counsel agrees to be paid over the first 12 months of the Plan on the amount of fees and expenses allowed by the Court in a final fee application, and Debtor shall make those payments in 12 equal monthly installments starting in the month after the Effective Date. |
| 3.03 **Priority tax claims** | Allowed priority tax claims will be paid consistently with § 1129(a)(9)(C) of the Code, to the extent that such claims are allowed by the Court. |
| 3.04 **Statutory fees** | All fees required to be paid under 28 U.S.C. § 1930 that are owed on or before the effective date of this Plan have been paid or will be paid on the effective date. *Because this case is subject to Subchapter V of Chapter 11 of the Code, no such fees shall be due*. |

| 3.05 **Prospective quarterly fees** | All quarterly fees required to be paid under 28 U.S.C. § 1930(a)(6) or (a)(7) will accrue and be timely paid until the case is closed, dismissed, or converted to another chapter of the Code. *Because this case is subject to Subchapter V of Chapter 11 of the Code, no such fees shall be due.* |

## Article 4: Treatment of Claims and Interests Under the Plan

4.01  Claims and interests shall be treated as follows under this Plan:

| *Class Number* | *Description of Class* | *Treatment of Class* |
|---|---|---|
| Class 1 | Priority unsecured claims | The IRS has filed a Proof of Claim asserting a *priority* unsecured claims under 507(a).<br><br>If that priority claim is allowed, then any such allowed claims entitled to priority under § 507(a) of the Code will be paid consistently with the requirements of the Bankruptcy Code. |
| Class 2 | Secured claim of Avery Francis and Mia Francis | The Class 2 claimants have a Judgment lien on Debtor's Residence, with a remaining balance due of approximately $49,000.<br><br>That claim shall be paid in full at the time when the Bankruptcy Court authorizes disbursements from excess tax sale proceeds regarding Debtor's Residence, and the Class 2 claimants shall retain their lien on Debtor's interest in Debtor's Residence, and any lien on related excess tax sale proceeds, until the Class 2 claim is paid in full. |
| Class 3 | Secured claim of Georgia Department of Revenue | The Class 3 claimant has a tax lien on Debtor's Residence, with a remaining balance due of approximately $40,000. |

|  |  | That claim shall be paid in full at the time when the Bankruptcy Court authorizes disbursements from excess tax sale proceeds regarding Debtor's Residence, and the Class 3 claimant shall retain its lien on Debtor's interest in Debtor's Residence, and any lien on related excess tax sale proceeds, until the Class 3 claim is paid in full. |
| Class 4 | Non-priority unsecured claims, also known as general unsecured claims | Class 4 claimants shall be paid their pro rata share of all general unsecured claims, after the payment of priority claims and administrative expenses, out of $6,332 per month for 60 months, based on their allowed claim amounts. |
| Class 5 | Equity security holder, i.e., claim of Mrs. Ukah as owner | Mrs. Ukah shall retain her ownership in assets as she is paying all net disposable income to claimholders for the maximum payment plan period under a Subchapter V plan.<br><br>Except as otherwise explicitly provided in the Plan, upon the Court's entry of the confirmation Order, all property comprising the estate (including any Retained Actions, but excluding property that has been abandoned pursuant to an order of the Bankruptcy Court) shall revest in Debtor free and clear of all claims, liens, charges, encumbrances, rights and Interests of creditors and equity security holders, except as specifically provided in the Plan.  As of the earlier of the Effective Date and the entry of a Final Decree, Debtor may operate her businesses and use, acquire, and dispose of property and settle and |

| | | compromise claims or interests without supervision of the Bankruptcy Court, free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and confirmation Order<br><br>Because this is a Subchapter V case, the Debtor is not required to satisfy the absolute priority rule in order to retain ownership of assets owned as of the Filing Date or acquired post-filing. |
|---|---|---|

## Article 5: Allowance and Disallowance of Claims

| | |
|---|---|
| 5.01 **Disputed claim** | A *disputed claim* is a claim that has not been allowed or disallowed by a final non-appealable order, and as to which either:<br><br>(i)  a proof of claim has been filed or deemed filed, and the Debtor or another party ininterest has filed an objection; or<br><br>(ii)  no proof of claim has been filed, and the Debtor has scheduled such claim as disputed, contingent, or unliquidated; or<br><br>(iii)  which is listed as disputed in this Plan. |
| 5.02 **Delay of distribution on adisputed claim** | No distribution will be made on account of a disputed claim unless such claim isallowed by a final non-appealable order. |

## Article 6: Provisions for Executory Contracts and Expired Leases

| | |
|---|---|
| 6.01 **Assumed executory contracts and unexpired leases** | An "*executory contract*" is one for which performance has not been completed and is incomplete to such an extent that the failure to continue performance would constitute a breach of the contract. |

(a) The Debtor assumes, and continues in effect, the following executorycontracts and/or unexpired leases as of the effective date:
1. any interests in limited liability companies or corporations to the extent deemed executory.

(b) Except for executory contracts and unexpired leases that have been assumed, before the effective date or under section 6.01(a) ofthis Plan, or that are the subject of a pending motion to assume, and if applicable assign, the Debtor will be conclusively deemed to have rejected all executory contracts and unexpired leases as of the effective date.

A proof of a claim arising from the rejection of an executory contract or unexpired lease under this section must be filed no later than **15 days** after the date of the order confirming this Plan or it shall be barred forever.

## Article 7: Means for Implementation of the Plan

Debtor will fund the Plan payments through her future earnings. Debtor has filed financial projections with this Plan showing that the proposed monthly payments are feasible based on projected income and expenses.

## Article 8: General Provisions

| | |
|---|---|
| 8.01 **Definitions and rules ofconstruction** | The definitions and rules of construction set forth in §§ 101 and 102 of the Bankruptcy Code shall apply when terms defined or construed in the Bankruptcy Code are used in this Plan. |
| 8.02 **Effective date** | The *Effective Date* of this Plan is the first business day following the date thatis **14 days** after the entry of the confirmation order.  If, however, a stay of the confirmation order is in effect on that date, the effective date will be the first business day after the date on which the stay expires or is otherwise terminated. |
| 8.03 **Severability** | If any provision in this Plan is determined to be unenforceable, the determination will in no way limit or affect the enforceability and operative effect of any other provision of this Plan. |

| 8.04 **Binding effect** | The rights and obligations of any entity named or referred to in this Plan willbe binding upon, and will inure to the benefit of the successors or assigns ofsuch entity. |
| --- | --- |
| 8.05 **Captions** | The headings contained in this Plan are for convenience of reference only anddo not affect the meaning or interpretation of this Plan. |
| 8.06 **Controlling effect** | Unless a rule of law or procedure is supplied by federal law (including the Bankruptcy Code or the Federal Rules of Bankruptcy Procedure), the laws of the State of Georgia govern this Plan and any agreements, documents, and instruments executed in connection with this Plan, except as otherwiseprovided in this Plan. |
| 8.07 **Corporate governance** | The Debtor is not a corporation, such that the Plan is not required to include provisions that might otherwise be required by § 1123(a)(6) of the Code. |
| 8.08 **Retention of Jurisdiction** | The Bankruptcy Court's retains jurisdiction after the effective date of the Plan, until this case is closed, to (a) resolve disputes over performance of the Plan, and (b) to enter a discharge of obligations of the Debtor, and (c) to enforce the injunction contained in this Plan, including injunction against collection from Debtor and Debtor's estate. Debtor may pay professional fees solely incurred after the effective date of the Plan without submission of a fee application, hearing, or Court order, but Debtor may not pay any professional fees incurred before the effective date of the Plan without submission of a fee application and entry of an order by the Bankruptcy Court authorizing such payment. |

## Article 9: Discharge

**Discharge of an individual Debtor under Subchapter V.**

**9.1.  Timing and scope of discharge.**

If the Debtor's Plan is confirmed under § 1191(a), on the effective date of the Plan, the Debtor will be discharged from anydebt that arose before confirmation of this Plan, to the extent specified in § 1141(d)(1)(A) of the Code. The Debtor will not be discharged from any debt:

(i)  imposed by this Plan; or (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of the Federal Rules of Bankruptcy Procedure.

Alternatively, if the Debtor's Plan is confirmed under § 1191(b), confirmation of the Plan does not discharge any debt provided for in thisPlan until the court grants a discharge on completion of all payments due within the first 3 years of this Plan, or as otherwise provided in § 1192 of the Code. The Debtor will not be discharged from any debt:

> (i) on which the last payment is due after the first 3 years of the plan, until the date of the last payment on that debt;or
> (ii) excepted from discharge under § 523(a) of the Code, except as provided in Rule 4007(c) of theFederal Rules of Bankruptcy Procedure.

**9.2.  Plan supersedes claimants' other rights.**  Except as otherwise specifically provided in the Plan or in the Confirmation Order, the distributions and rights that are provided in the Plan shall be in complete satisfaction, discharge, and release of all claims and causes of action against Debtor, whether known or unknown, contingent or not contingent, liquidated or unliquidated, including any and all liabilities of Debtor, liens on Debtor's assets, obligations of Debtor, rights against Debtor, or Debtor's estate, that arose prior to the Effective Date, regardless of whether a claimant accepted or rejected the Plan.

**9.3.  Discharge injunction.**  Upon entry of a confirmation Order in this case, except as provided for in this Plan, the confirmation Order shall act as a permanent injunction against any person or entity commencing or continuing any action, employment of process, or act to collect, offset, or recover any claim or cause of action, except as provided for under this Plan including Paragraph 9.1 of this Plan which delays a discharge in certain instances, against: (1) Debtor, or (2) against any property of Debtor, including any company of which Debtor is one hundred percent owner. Such injunction shall survive the closure of the Bankruptcy Case and this Court shall retain non-exclusive jurisdiction to enforce such injunction.

**9.4. Claimants receiving no payment.**  The holders of claims receiving no payment under this Plan, including claimants whose claims were objected to in this Plan, are bound by this Plan, including by the discharge provisions and discharge injunction contained herein, despite not receiving any payment under this Plan, as their rights (or lack of rights) to payments have been fully adjudicated upon confirmation of this Plan.

## Article 10: Other Provisions

**10.1. Time.** Whenever the time for the occurrence or happening of an event, including payments, as set forth in this Plan falls on a day which is a Saturday, Sunday, or legal holiday under the laws of the United States of America or the State of Georgia, then the time for the next occurrence or happening of said event shall be extended to the next day following which is not a Saturday, Sunday, or legal holiday.

**10.2.  Events of Default.** Unless otherwise specifically provided in a class under the Plan, in the event of a default by Debtor in payments under the Plan or otherwise, an affected claimant must send written notice ("Default Notice") to Debtor at the addresses of record for Debtor as reflected on the docket for this Bankruptcy Case, unless Debtor has provided the claimant with a written notice of a change of address. Such Default Notice must contain the reason for the default and if such default is monetary, the amount of the default and amount necessary to cure the default, as well as notice that Debtor has

ten (10) days (in the case of a monetary default) and thirty (30) days (in the case of a non-monetary default) from receipt by Debtor and Debtor's counsel of the Default Notice (or the following business day if the 10th or 30th day does not fall on a business day) to cure such default (and the address for payment, which will accept overnight deliveries, in the event of a monetary default). The claimant must send such Default Notice to Debtor via certified mail or recognized overnight carrier, and also must send a copy via email or fax and certified mail to Debtor' legal counsel at the address reflected in the then current directory of the State of Bar of Georgia. Debtor shall have ten (10) days or thirty (30) days (as applicable) from Debtor's and Debtor's counsel's receipt of the Default Notice to cure such default. Receipt by Debtor's Attorney shall not be deemed receipt by Debtor of the required Default Notice. Notwithstanding anything to the contrary in the Plan or otherwise, a default under one class of claims or sub-class of claims shall not constitute a default under any other class of claims or sub-class of claims. (For example, a default under Class 4 shall not constitute a default under Class 1).

**10.3.  Remedies for Uncured Default.**  If a claimant has properly served a Default Notice in accordance with the provisions of this Plan, on each person and entity entitled to service, and in the manner set forth in this Plan, and if a default has not been cured within the time required to cure a default set forth in this Plan, then a claimant who has given proper notice shall be entitled to the following remedies:  (a) if the Plan was approved as a consensual Plan, the claimant may sue to enforce the terms of the Plan in any court with jurisdiction over Debtor; and, (b) if the Plan was approved as a non-consensual Plan, then Debtor shall sell non-exempt, or borrow against, assets sufficient to pay, in full, the claimant (or claimants) who has (or have) provided a Default Notice that has not been cured within the time set forth in this Plan.

**10.4.  Preservation of Causes of Action.**  Debtor will retain all rights to assert causes of action that existed on the Filing Date or arose or accrued between the filing date and the Effective Date (collectively, the "*Retained Actions*"), and may (but is not required to) enforce all Retained Actions. After the Effective Date, Debtor, in its sole and absolute discretion, shall have the right to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), without further approval of the Bankruptcy Court.  The failure of Debtor to specifically list any claim, right of action, suit, proceeding or other Retained Action in this Plan does not, and will not be deemed to, constitute a waiver or release by Debtor of such claim, right of action, suit, proceeding or other Retained Action, and Debtor will retain the right to pursue such claims, rights of action, suits, proceedings and other Retained Actions and, therefore, no preclusion doctrine, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable or otherwise) or laches will apply to such claim, right of action, suit, proceeding or other Retained Actions upon or after the confirmation or consummation of this Plan.

**10.5.  No Interest on Claims or Interests.** Unless otherwise specifically provided for in this Plan, the Confirmation Order, or a post-petition agreement in writing between the Debtor and a claimant, post-petition interest shall not accrue or be paid on claims, and no claimant shall be entitled to interest accruing on or after the Filing Date on any claim. Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any disputed claim in respect of the period from the Effective Date to the date a final determination is made when and if such disputed claim becomes an allowed claim

**10.6.  Delivery of Distributions.** The distribution to a holder of an allowed claim shall be made by Debtor (a) at the address set forth on the proof of claim filed by such claim holder, (b) at the address

set forth in any written notices of address change delivered to Debtor after the date of any related proof of claim, (c) at the addresses reflected in the Schedules if no proof of claim has been filed and Debtor has not received a written notice of a change of address, or (d) if claimant's address is not listed in the Schedules, at the last known address of such claimant according to the Debtor's books and records. If any claimant's Distribution is returned as undeliverable, no further distributions to such claimant shall be made unless and until Debtor is notified by such claimant in writing of a then-current address, at which time Debtor shall recommence distributions to such claimant without interest but further provided that (i) any distributions not claimed within 6 months of return shall be irrevocably retained by Debtor and (ii) such claimant shall waive its right to such distributions. All Distributions returned to Debtor and not claimed within six (6) months of return shall be irrevocably retained by Debtor notwithstanding any federal or state escheat laws to the contrary

If any distribution on an unsecured claim ("Unsecured Distribution") is tendered by Debtor to a holder of an unsecured claim and returned, refused, or otherwise rejected ("Unsecured Distribution Refusal"), then Debtor shall not be responsible for making any further Unsecured Distribution on account of such unsecured claim.

**10.7.  Fractional payments.** Any other provision of this Plan notwithstanding, the Debtor shall not be required to make Distributions or payments of fractions of cents. Whenever any payment of a fraction of a cent under this Plan would otherwise be called for, the actual payment shall reflect a rounding of such fraction to the nearest whole cent (up or down), with half cents or less being rounded down.

**10.8.   Withdrawal of Plan prior to confirmation.** Debtor reserves the right, unilaterally and unconditionally, to revoke and/or withdraw this Plan at any time prior to entry of the Confirmation Order, and upon such revocation and/or withdrawal this Plan shall be deemed null and void and of no force and effect.

**10.9.  No Bar to Suits by Debtor.**  Except as otherwise expressly provided in this Plan, neither this Plan or confirmation hereof shall operate to bar or estop Debtor from commencing any cause of action, or any other legal action against any holder of a claim or any individual or entity, regardless of whether such cause of action arose prior to or after the confirmation date and regardless of whether the existence of such cause of action was disclosed in any disclosure statement filed by Debtor.

**10.10.  Exhibits / Schedules.** All exhibits and schedules to this Plan, and all attachments thereto, are incorporated into and are a part of this Plan as if set forth in full herein.

**10.11.  Tax Consequences Notice and Disclaimer.**  TAX CONSEQUENCES RESULTING FROM CONFIRMATION OF THE PLAN CAN VARY GREATLY AMONG THE VARIOUS CLASSES OF CREDITORS AND HOLDERS OF INTERESTS, OR WITHIN EACH CLASS. SIGNIFICANT TAX CONSEQUENCES MAY OCCUR AS A RESULT OF CONFIRMATION OF THE PLAN UNDER THE INTERNAL REVENUE CODE AND PURSUANT TO STATE, LOCAL, AND FOREIGN TAX STATUTES. BECAUSE OF THE VARIOUS TAX ISSUES INVOLVED, THE DIFFERENCES IN THE NATURE OF THE CLAIMS OF VARIOUS CREDITORS, THE TAXPAYER STATUS AND METHODS OF ACCOUNTING AND PRIOR ACTIONS TAKEN BY CREDITORS WITH RESPECT TO THEIR CLAIMS, AS WELL AS THE POSSIBILITY THAT EVENTS SUBSEQUENT TO THE DATE HEREOF COULD CHANGE THE TAX CONSEQUENCES, THIS DISCUSSION IS INTENDED TO BE GENERAL IN NATURE ONLY.

NO SPECIFIC TAX CONSEQUENCES TO ANY CREDITOR OR HOLDER OF AN INTEREST ARE REPRESENTED, IMPLIED, OR WARRANTED. EACH HOLDER OF A CLAIM OR INTEREST SHOULD SEEK PROFESSIONAL TAX ADVICE. THE PROPONENT ASSUMES NO RESPONSIBILITY FOR THE TAX EFFECT THAT CONSUMMATION OF THE PLAN WILL HAVE ON ANY GIVEN HOLDER OF A CLAIM OR INTEREST. HOLDERS OF CLAIMS OR INTEREST ARE STRONGLY URGED TO CONSULT THEIR OWN TAX ADVISORS REGARDING THE FEDERAL, STATE, LOCAL, AND FOREIGN TAX CONSEQUENCES OF THE PLAN AS APPLIED TO THEIR SITUATION.

**10.12.  Substantial Consummation and Subchapter V Trustee's Duties; Subchapter V Trustee's fees.**  The Subchapter V Trustee was appointed by the United States Trustee in this case to perform the duties described in section 1183(b) of the Bankruptcy Code, one of which is to facilitate the development of a consensual plan of reorganization.

10.12(a).  *Termination of the Subchapter V Trustee's Services.*  The services of the Subchapter V Trustee shall terminate upon "substantial consummation" of the Plan, as defined in section 1101(2) of the Bankruptcy Code.  Debtor shall directly make all payments required under this Plan, including the initial payments required for substantial consummation of the Plan. This Plan shall be deemed substantially consummated, and the Subchapter V Trustee's duties shall terminate, upon Debtor making the first monthly distributions provided for in this Plan and no event of default under the Plan having then occurred.

10.12(b).  *Compensation of the Subchapter V Trustee.*  The Subchapter V Trustee shall be entitled to apply for reasonable compensation for the Subchapter V Trustee's fees and expenses under 11 U.S.C. §§ 330 and 503(b)(3) periodically following confirmation of the Plan.  Debtor shall pay all compensation awarded the Subchapter V Trustee as agreed by Debtor and the Subchapter V Trustee, or otherwise in twelve (12) equal monthly payments over the period (i) starting on the first day of the month immediately following the month in which the order on the Subchapter V Trustee's application for compensation became a Final Order and (ii) ending on the first day of the twelfth month of such payment term. Any and all unpaid accrued and approved compensation of the Subchapter V Trustee shall be paid in full by the Debtor as part of its Final Distribution.

Respectfully Submitted,

/s/ Aneaka Ukah                                    Aneaka Ukah
[Debtor's Signature/Signature of Plan Proponent]          [Printed Name]


/s/ Michael Robl                                   Michael D. Robl
[Signature of the Attorney for Plan Proponent]            [Printed Name]

**EXHIBIT "A"**

**Organizational Chart**

**E.S. Real Estate Consortium, Corp**

- E.S. Design and Construction, LLC
  - Built By English, LLC
  - Redefined LLC
- E.S. Realty Group, LLC
  - Selling Real Estate, LLC
    - Selling N Atlanta, LLC
    - Selling N Richmond, LLC
    - Selling N Charleston, LLC
  - WholeSale Real Estate, LLC
    - WholeSale Lending, LLC
      - WholeSale Lending Georgia, LLC
    - WholeSale Listings Co LTD
      - WSRE Georgia, LLC
      - WSRE S Carolina, LLC
      - WSRE Florida, LLC
      - WSRE DC Metro
      - WSRE Tennessee
      - WholeSale Listings Tennessee, LLC
- E.S. Investment, Inc
  - The Construction Loan Company, LLC



**EXHIBIT "B"**

**Liquidation Analysis**

***Introduction to hypothetical liquidation analysis:***

The purpose of this hypothetical liquidation analysis is to provide information to creditors to compare the payments proposed by the Plan to what creditors might receive if all assets of Debtor were liquidated instead.  Pursuant to Section 1129(a)(7) of the Bankruptcy Code, the Court may not confirm a chapter 11 plan unless the plan provides each holder of a claim, who does not otherwise vote in favor of the plan, with property (including payment) of a value, as of the effective date of the plan, that is not less than the amount that such holder would receive or retain if the debtor was liquidated under chapter 7 of the Bankruptcy Code.  To demonstrate that the proposed Plan satisfies the "best interests" of creditors test, Debtor has prepared the following hypothetical liquidation analysis (the "Liquidation Analysis"), with the assistance of its legal counsel (and potentially its financial and restructuring advisors), based on certain assumptions discussed in the following notes to the Liquidation Analysis.

Any capitalized terms used in this Liquidation Analysis but not otherwise defined herein shall have the meanings given to them in the Plan to which this Liquidation Analysis is an exhibit.

***Limitations on liquidation analysis:***

The process of estimating the costs of, and proceeds from, the hypothetical liquidation of Debtor's assets in a chapter 7 case involves the extensive use of assumptions that are considered reasonable by Debtor based upon its business judgment, but may be subject to significant business and economic factors and circumstances, some of which are beyond the control of Debtor.  Some assumptions in the Liquidation Analysis might not materialize in an actual chapter 7 liquidation, and unanticipated events and circumstances could materially affect the ultimate results in an actual chapter 7 liquidation.  The Liquidation Analysis was prepared for the sole purpose of generating a reasonable, good faith estimate of the proceeds that would be generated if the Debtor's assets were liquidated in accordance with Chapter 7 of the Bankruptcy Code.  The Liquidation Analysis is not intended and should not be used for any other purpose. The financial information in the Liquidation Analysis was not compiled or examined by any independent accountants.

NEITHER DEBTOR, NOR ANY LEGAL COUNSEL OR OTHER ADVISORS RETAINED BY DEBTOR, MAKE ANY REPRESENTATIONS OR WARRANTIES THAT THE ACTUAL DISTRIBUTION TO CREDITORS WOULD APPROXIMATE THE ESTIMATES IN THE LIQUIDATION ANALYSIS.  ACTUAL RESULTS COULD VARY SUBSTANTIALLY FROM THE CONCLUSIONS IN THE LIQUIDATION ANALYSIS.

Debtor has estimated amounts of allowed claims based upon a review of claims listed on the Debtors' Schedules of Assets and Liabilities and the filed Proofs of Claim.  The Liquidation Analysis also includes estimates for claims that have been asserted in this Chapter 11 Case, but which could be asserted and allowed in a chapter 7 liquidation, including unpaid chapter 11 Administrative

Expense Claims, and chapter 7 administrative claims such as costs of winding down business operations and Chapter 7 trustee statutory fees and legal fees of counsel for the Chapter 7 trustee.

The Bankruptcy Court has not fixed the total amount of allowed claims. Thus, Debtor's estimate of allowed claims set forth in this Liquidation Analysis could differ from the Court's final determination, which may change the amount of distributions made on account of allowed claims under the Plan.

NOTHING CONTAINED IN THE LIQUIDATION ANALYSIS IS INTENDED TO BE OR CONSTITUTES AN ADMISSION BY DEBTOR, INCLUDING REGARDING THE ACTUAL AMOUNT OF ALLOWED CLAIMS IN THE CHAPTER 11 CASE, WHICH COULD DIFFER MATERIALLY FROM THE ESTIMATED AMOUNTS SET FORTH IN THE LIQUIDATION ANALYSIS.

***Hypothetical date of conversion to Chapter 7 and appointment of a Trustee:***

This Liquidation Analysis has been prepared with the assumption that Debtor converted this Chapter 11 case to a Chapter 7 case on or about March 1, 2025 (the "Conversion Date").  For purposes of this analysis, Debtor assumes that the Bankruptcy Court would appoint a Chapter 7 trustee (the "Trustee") on the Conversion Date to oversee the liquidation of Debtor's estate, during which time all of Debtor's assets would be sold, distributed, or abandoned, or surrendered to any respective lien holders, and the cash proceeds, after payment of liquidation-related fees, expenses, and costs, would then be distributed to creditors in accordance with relevant law.

***Assumptions about liquidation costs and recoveries:***

**Duration of Chapter 7 liquidation and related costs**.  Debtor has assumed that liquidation of its assets would occur over approximately six (6) months.  Debtor has utilized the six (6) month time-frame in its assumptions, rather than a longer time period, because the Bankruptcy Code requires that a trustee collect and convert the property of Debtor into cash for creditors, and close the bankruptcy estate, as expeditiously as is compatible with the best interests of parties in interest. The actual time required for liquidation could vary significantly from that estimate.  A longer liquidation process might generate a larger or smaller net distribution to creditors – *e.g.*, allowing more time for the sale of assets might bring greater sale prices, but taking more time to liquidate assets might also increase liquidation fees, legal fees, expenses and carrying costs (such as real property taxes on real property, interest accruing on secured loans, etc.).  Thus, the net results in this Liquidation Analysis could vary from an actual liquidation due to such timing differences and associated increases or decreases in realized net funds from liquidation.

**Additional claims may arise during liquidation**. The liquidation could trigger certain claims that do not currently exist, and potentially would not exist, if distributions on existing claims were paid under the Plan.  For instance, if Debtor's business operations cease then additional claims may be asserted for things such as employee terminations, rejection of unexpired leases and executory contracts, and other similar claims.  These additional claims could be substantial.  Some post-petition claim will be entitled to priority in payment ahead of general unsecured claims.

**Assumptions about preferential transfers or fraudulent transfers**. This Liquidation Analysis does not assume that any amounts are recovered, or spent to recover, preferential transfers or fraudulent transfers (actual or constructive in nature). The potential amounts which could be recovered from such actions and the costs of such litigation are presently subject to uncertainty.

**Assumptions about Trustee's fees and expenses.** The expenses incurred by the Trustee during a hypothetical Chapter 7 case ("Trustee's Expenses"), including expenses from selling Debtor's assets, will be entitled to payment in full prior to any distribution to general unsecured creditors. The estimate of Trustee's Expenses used in this Liquidation Analysis includes certain administrative, legal, accounting and other fees, expenses, and costs.

The projected Chapter 7 trustee fees are calculated based upon the statutory scale contained in Section 326(a) of the Bankruptcy Code, which provides that "the court may allow reasonable compensation…of the trustee for the trustee's services, payable after the trustee renders such services, not to exceed 25 percent on the first $5,000 or less, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000, and reasonable compensation not to exceed 3 percent of such moneys in excess of $1,000,000, upon all moneys disbursed or turned over in the case by the trustee to parties in interest, excluding the debtor, but including holders of secured claims."

**Distribution of net proceeds**. Chapter 11 administrative expense claim amounts, professional fees, U.S. Trustee fees, and other such claims that may arise in a Chapter 7 liquidation would be paid in full from the liquidation proceeds before the balance of those proceeds would be made available to pay general unsecured claims. When applicable, under the "absolute priority rule," no junior creditor would receive any distribution until all senior creditors are paid in full.

***Conclusion regarding Liquidation Analysis:***

This Liquidation Analysis indicates that, based on the assumptions contained herein, the Plan would provide creditors with a distribution of property (including cash) that is equal to or greater than the amount that they would receive through a liquidation of Debtor's assets under chapter 7 of the Bankruptcy Code.

**Assets for Liquidation**

| *Asset* | *Value to Estate* | *Notes on Value to Estate* |
|---|---|---|
| Debtor's Residence | $439,500 | Total value of $1,100,000; owned 50% by spouse; one-half value in estate is $550,000, less homestead exemption of $21,500 results in value to estate of $528,500; that is further reduced by the secured debt of $49,000 owed to Mia |

| | | |
|---|---|---|
| | | Francis and Avery Francis, for a value to the estate of $479,500, which is further reduced by a secured debt to the Georgia Department of Revenue in the approximate amount of $40,000 for a value to the estate of $439,500 |
| Vehicles | $0 | Debtor does not own any vehicles |
| Household good, furnishings, electronics, books, clothes, jewelry | $0.00 | These items were valued in Debtor's Schedules at an unknown amount, and are anticipated to have $0.00 liquidation value after applying exemptions |
| Bank accounts and investment accounts | $500 | The Schedules reflect only nominal cash on hand as of the Petition date.<br><br>Cash under a hypothetical conversion might be less than the stated amount, as the cash balance varies day to day. That may be due to factors such as incoming receipts, outgoing payment of expenses, interest accrual on interest bearing accounts, etc. |
| Company ownership value | $0.00 | The Affiliated Entities, as defined in the Plan, are subject to lawsuits and without value in a liquidation, as their sole value is derived from Mrs. Ukah's services |
| Other assets | $0.00 | The category of "other assets" includes potential avoidance actions. Debtor has presently included those at $0.00 value, which is not a concession or admission of any avoidance claim value, but rather reflects difficulty in valuing such claims accurately for a range of reasons, including collectability from defendants. Debtor reserves all rights to assert such claims. |
| **TOTAL** | **$440,000.00** | |

**Liquidation Costs**

| Estimated Liquidation costs | Low end | High end |
|---|---|---|
| Chapter 7 Trustee statutory fees | $25,250 | $25,250 |
| Chapter 7 Trustee's counsel fees | $0.00 | $50,000 |
| Chapter 7 Trustee's accountant / tax advisor fees | $3,000 | $15,000 |
| Administrative expenses other than professional fees (e.g., storage fees, real estate broker commissions, auctioneer fees, electronic data hosting services, postage for service of pleadings, etc.) | $100 | $2,500 |
| TOTAL | $28,350.00 Rounded to $28,000 | $92,750.00 Rounded to $93,000 |

**Notes to Estimated Liquidation costs:**

1. The table of estimated liquidation costs assumes a full sale of all non-exempt assets, with equity, at the Scheduled values for maximum proceeds to the estate.  It is possible that fewer than all assets would be sold due to the condition of assets, a limited market for used assets, etc.
2. Chapter 7 Trustee statutory fees are estimated at 25 percent on the first $5,000 or less distributed, 10 percent on any amount in excess of $5,000 but not in excess of $50,000, 5 percent on any amount in excess of $50,000 but not in excess of $1,000,000.  Those percentages are calculated based on $440,000 of distributed cash, the maximum projected herein.  Specifically, 25 percent on the first $5,000 distributed amounts to $1,250; 10 percent on the amount in excess of $5,000 but not in excess of $50,000 amounts to $4,500: and, 5 percent on any amount in excess of $50,000 up to $440,000 amounts to $19,500. That total commission therefore would be $25,250.
3. Trustee professional fees are an opinion from Debtor's legal counsel based on direct experience in converted cases and knowledge of other converted cases.

4. Accountant / tax advisor professional fees are an opinion from Debtor's legal counsel based on direct experience in converted cases and knowledge of other converted cases.
5. Administrative expenses other than professional fees are an opinion from Debtor's legal counsel based on direct experience in converted cases and knowledge of other converted cases.

**Amounts Distributed from Liquidation**

| Liquidation Distribution Estimates | Estimated distribution based on $440,000 of funds from liquidation |
|---|---|
| Less costs of liquidation (calculated as midpoint between a low-end estimate of $17,150 and a high-end estimate of $81,550) | $74,500 |
| Net funds available to distribute after costs of liquidation | $365,500 |
| Secured claims (already factored into asset value to estate above) | $0.00 |
| Unclassified claim: Chapter 11 Debtor's legal fees entitled to administrative priority in converted case | $50,000 |
| Unclassified claim: Subchapter V Trustee's legal fees (and/or Creditor Committee Counsel's legal fees) entitled to priority in converted case | $15,000 |
| Balance available to pool of unsecured priority and general unsecured creditors | $300,500 |
| Divided by 60 months | $5,008.33 |

**Notes to Liquidation Distribution Estimates:**

1. Debtor's Plan proposes to pay creditors with allowed claims the full amount of their claims.
2. The estimate of liquidation distributions is predicated on assumptions, which may prove to be wrong.  Actual liquidation distributions can vary substantially from projections.
3. The amount included in the foregoing analysis for legal fees of Debtor's counsel is not a flat fee, or a cap on fees.  Actual fees may exceed, or be lower than, that projection.
4. The amount included in the foregoing analysis for legal fees of the Subchapter V Trustee is not a flat fee, or a cap on fees.  Actual fees may exceed, or be lower than, that projection.

**EXHIBIT "C"**

**Financial Projections**

Debtor's projected income and expenses are as shown on Schedule I (income) and Schedule J (expenses) filed within her Schedules of Assets and Liabilities at Docket No. 18, which are incorporated herein by reference as if set out in full. That income, however, should be increased by $3,000 per month to account for Debtor's spouse's income for purposes of determining available household income. That raises the net disposable income from $3,332.58 per month to $6,332.58 per month.